# In the United States Court of Federal Claims

Bid Protest
No.  15-30C
(Filed Under Seal: June 29, 2015 | Reissued: July 10, 2015)[1]

|  |  |  |
|---|---|---|
| GUARDIAN MOVING AND STORAGE CO., INC., | ) ) ) ) | |
| Plaintiff, | ) ) | Bid Protest; Corrective Action; Motion to Dismiss; Standing; Mootness; Motion |
| v. | ) ) | for Judgment on the Administrative Record; FAR 15.308; FAR 15.307(b); |
| THE UNITED STATES OF AMERICA, | ) ) | FAR 52.212-1; FAR 15.206 FAR 15.306 |
| Defendant, | ) ) | |
| and | ) ) | |
| METROPOLITAN VAN AND STORAGE, INC., | ) ) ) | |
| Defendant-Intervenor. | ) | |

*David Bailey Dixon*, Buchanan Ingersoll & Rooney P.C., Washington, D.C., for plaintiff.

*Jeffrey David Klingman*, Trial Attorney, with whom were *Benjamin C. Mizer*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Donald E. Kinner*, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for defendant.  *Marvin Kent Gibbs*, AFLOA/JAQ, and *Peter B. Ries*, USTRANSCOM TCJA, Of Counsel.

*Joseph Gilbert Billings*, Miles & Stockbridge P.C., Baltimore, M.D., for defendant-intervenor.  *Rita J. Piel*, Miles & Stockbridge P.C., Baltimore, M.D., Of Counsel.

---

[1] This Opinion was previously issued under seal on June 29, 2015, and the Clerk of the Court entered judgment on June 30, 2015.  The parties were given the opportunity to propose redactions on or before July 7, 2015.  Because the parties proposed no redactions, the Court reissues its decision without redactions.

## OPINION AND ORDER

**KAPLAN, Judge.**

Before the Court are three bid protests brought by one offeror, Guardian Moving and Storage Inc. ("Guardian"), during the course of a single procurement.  More specifically, Guardian filed (a) a post-award protest of the initial award by the United States Transportation Command ("USTRANSCOM" or "the agency") to Metropolitan Van and Storage, Inc. ("MVS") of a combined East and West Coast contract for non-temporary storage of household goods and unaccompanied baggage belonging to military service members and Department of Defense civilian employees; (b) a pre-award protest of the agency's decision in response to Guardian's original protest to take corrective action and reevaluate Guardian's and MVS's proposals; and (c) a post-award protest of the agency's decision again to award the combined East and West Coast contract to MVS after the reevaluation.  For the reasons set forth below, (1) Guardian's first post-award protest is **DISMISSED** as moot; (2) the government's and the intervenor's motions for judgment on the administrative record are **GRANTED**; and (3) all other pending motions are **DENIED**.

## BACKGROUND

### I.     The Solicitation

On July 2, 2014, the Military Distribution and Deployment Command, a component of USTRANSCOM, issued Request for Proposals ("RFP" or "solicitation") No. HTC711-14-R-R011 for non-temporary storage of household goods ("HHG") and unaccompanied baggage ("UB") belonging to military service members and Department of Defense civilian employees on the East and West Coasts of the United States.  Corrected Admin. R. ("AR") Tab 23 at 364-65, 398.[2]  The RFP restricted the competition to small businesses meeting the size standard of NAICS Code 493110.  AR Tab 23 at 365.  Offerors could submit a proposal for the East Coast only, a proposal for the West Coast only, and/or a combined proposal for both the East and West Coasts.  AR Tab 23 at 367-68.  The solicitation was amended twice.  AR Tabs 24, 51.

The solicitation required that proposals consist of three sections: Part I – RFP Documents; Part II – Technical Proposal; and Part III – Pricing Proposal.  AR Tab 51 at 1399. In Part I, offerors were instructed to provide, among other things, (1) a "[f]lood plain report from the Federal Emergency Management Agency ["FEMA"], the United States Army Corps of Engineers or [a] disinterested third party professional engineer/surveyor"; and (2) "[d]ocumentation signed by the Local Fire Marshall [sic] (or authorized representative) affirming that the facility meets all local codes and ordinances [and] dated within 30 days of [the] proposal submission date."  AR Tab 51 at 1399.  In Part II, offerors were to describe their approaches for achieving the objectives stated in the Performance Work Statement ("PWS").  Id. at 1400.  For instance, PWS paragraph 1.3.1.1.1 provides that "[t]he contractor shall be fully operational to begin accepting HHG/UB inventory and associated documentation not later than 30 days after

---

[2] Citations to the AR refer to the corrected administrative record filed on March 24, 2015 as well as the additional tabs filed on May 8, 2015.

award, as directed by the Contracting Officer." Id. at 1405.  Paragraph 1.3.3.1 provides that "[t]he contractor shall operate warehouse storage facilities capable of storing up to fifteen million (15,000,000) gross pounds of HHG/UB annually." Id. at 1406.  Paragraph 1.3.3.1.2 provides that "[a]ll storage facilities shall provide firewall separation for every three (3) million gross pounds of stored personal property lots," and that "[f]ire aisles shall meet local fire regulations as evidenced in the approved Fire Marshal Certification for all storage facilities" (firewall/fire aisle requirement). Id.  Paragraph 1.3.3.1.3 provides that "[a]ll storage facilities shall be located above the 100-year flood plain for the area" (flood plain requirement). Id.

Pursuant to Federal Acquisition Regulation (FAR) 52.212-1(g), the Government intended "to evaluate proposals and award a contract(s) without conducting discussions." Id. at 1400. However, the government reserved the right "to conduct discussions if it is determined to be in the best interest of the Government." Id.

In accordance with FAR 52.212-2(a), the award would be made on a lowest-price, technically acceptable basis. Id. at 1400.  Accordingly, the agency would add the total proposed prices of the lowest-price, technically acceptable East Coast proposal and the lowest-price, technically acceptable West Coast proposal, and it would compare the resulting, aggregated price with the total proposed price of the lowest-price, technically acceptable combined proposal for both the East and West Coasts. Id.  at 1401.  If the total proposed price of the lowest-price, technically acceptable combined proposal were less than or equal to the aggregated price of the lowest-price, technically acceptable East Coast proposal and the lowest-price, technically acceptable West Coast proposal, the agency would award a single contract to the offeror who submitted that combined proposal. Id.

## II.    Initial Proposals and Award to MVS

Guardian, the plaintiff here and the East Coast incumbent, submitted an East Coast proposal, a West Coast proposal, and a combined proposal. See AR Tab 28 at 563-64.  MVS, the intervenor here and the West Coast incumbent, submitted a West Coast proposal and a combined proposal. AR Tabs 29-30.[3]

The agency initially determined that Guardian's East Coast proposal was technically unacceptable but within the competitive range, and after discussions, the agency requested and Guardian submitted a final proposal revision ("FPR"). AR Tab 32 at 1012, AR Tab 34 at 1018. After reviewing MVS's proposals, the agency determined that clarifications were required in accordance with FAR 15.306(b). AR Tab 32 at 1013.  Specifically, the agency asked MVS to clarify that the person who signed the documentation affirming that MVS's East Coast facility met all local codes and ordinances was an authorized representative of the local fire marshal, as required by the solicitation. Id.  In addition, the agency asked MVS to clarify that it met the size standard associated with the NAICS code specified for this solicitation and that the System for Award Management ("SAM database") was updated to reflect that MVS met this standard. Id. MVS responded by providing a letter from the local building official responsible for fire and

---

[3] One other offeror submitted a proposal, but that offeror was eliminated from the competitive range relatively early in the procurement process. See AR Tab 33 at 1017.

safety code compliance and confirming that it met the size standard and that the SAM database had been updated.  AR Tab 36 at 1087-88.

Thereafter, the agency determined that Guardian's offer was the lowest-price, technically acceptable, East Coast proposal and that MVS's was the lowest-price, technically acceptable West Coast proposal.  Id. at 1030, 1104-05.  It concluded, however, that the total proposed price of MVS's combined proposal was lower than the aggregated price of Guardian's East Coast proposal and MVS's West Coast proposal.  Id. at 1104-08.  Therefore, the agency awarded a contract for the East and West Coasts combined to MVS.  AR Tab 39 at 1244.

### III.    Guardian's First Post-Award Protest and USTRANSCOM's Corrective Action

On January 12, 2015, Guardian protested the award to MVS, filing its first complaint and a motion for a preliminary injunction in this Court.  MVS moved to intervene, and the Court granted its motion.

Guardian filed its first motion for judgment on the administrative record ("MJAR") on January 30, 2015.  In that motion, Guardian argued that MVS's proposal was unacceptable and ineligible for award because (1) MVS's proposal failed to provide the required fire marshal certification for its proposed East Coast facility, and the FAR did not authorize the agency to cure this deficiency using clarifications; (2) MVS's proposal failed to include the required 100-year flood plain report; (3) MVS's proposal failed to include the required small business representation and certification with its proposal, and the FAR did not authorize the agency to cure this deficiency using clarifications; (4) neither MVS's proposed East Coast facility nor its proposed West Coast facility met the requirements of PWS 1.3.3.1 regarding the facilities' ability to store fifteen million gross pounds of HHG/UB annually; (5) MVS's technical proposal failed to address the requirements of PWS 1.3.3.1.2 regarding fire wall separation and fire aisles. Pl.'s Mem. in Supp. of MJAR 20-45, Feb. 10, 2015, ECF No. 35.

In response to Guardian's protest, on February 10, 2015, the government notified the Court that USTRANSCOM had proposed taking corrective action in the case.  Def.'s Notice of Proposed Corrective Action, Feb. 10, 2015, ECF No. 39.  In an email and an attached document dated February 19, 2015, the agency notified Guardian and MVS that, "[a]s a result of a post award protest before the Court of Federal Claims, the Contracting Officer has decided to open technical discussions for [the] subject solicitation."  AR Tabs 56, 56a, 57, 57a.

Upon the agency's reevaluation of the proposals within the competitive range, the agency determined that all the technical ratings for all of the proposals—Guardian's East Coast proposal, MVS's West Coast proposal, and MVS's combined proposal—were unacceptable, and the agency issued evaluation notices specifying each proposal's deficiencies.  AR Tabs 56-57f. Guardian's proposal, according to the agency, "failed to confirm that the proposed facility(ies) is/are located above the 100 year flood plain as evidenced by a flood plain report from the Federal Emergency Management Agency, the United States Army Corps of Engineers or disinterested third party professional engineer/surveyor."  AR Tab 56b.  MVS's West Coast proposal and combined proposal, according to the agency, (1) "failed to address/confirm that all [proposed] storage facilities shall provide firewall separation for every three (3) million gross

pounds of stored personal property lots," AR Tabs 57b, 57d; (2) "failed to confirm that the proposed facility(ies) is/are located above the 100 year flood plain as evidenced by a flood plain report from the Federal Emergency Management Agency, the United States Army Corps of Engineers or disinterested third party professional engineer/surveyor," AR Tabs 57c, 57f; and (3) "failed to affirm that the proposed . . . facility(ies) meet[] all local fire and safety codes and ordinances," as evidenced by the signature of the local fire marshal, AR Tabs 57d; see also AR Tabs 57b.

Both offerors were initially required to respond to the evaluation notices and submit FPRs by February 27, 2015, AR Tabs 56a, 57a, but after MVS requested a two-week extension, the agency notified the offerors on February 25 that FPRs would not be due until "12 March 2015 at 1600 CST." AR Tabs 59a, 59b. On March 12, Guardian submitted its FPR, AR Tab 61b, but MVS requested an additional one-week extension, explaining to the contracting officer that, despite contacting the necessary local officials immediately after issuance of the evaluation notices and several times since, MVS was still waiting for a response. AR Tab 62. The contracting officer granted the extension and notified Guardian, in an email time stamped "March 12, 2015 3:33 PM," that it would be permitted to change, modify, or supplement its FPR until March 20. AR Tab 63. MVS submitted its FPRs on March 18. AR Tab 68. Guardian did not submit a changed, modified, or supplemented FPR.

Meanwhile, on February 13, 2015, Guardian amended its complaint pursuant to RCFC 15(a)(1)(B). Several days later, Guardian filed a notice to the Court that it objected to the agency's corrective action and that it intended to challenge the reevaluation. The government, for its part, moved to dismiss Guardian's first post-award protest as moot. After a status conference with the Court, Guardian filed a motion for leave to file an amended complaint to include a pre-award protest of the agency's corrective action. The government opposed Guardian's motion, arguing that amendment would be futile. Finding that "it would be most appropriate and would serve judicial economy to address the legal sufficiency of Guardian's amended complaint in the context of full briefing on motions to dismiss and/or cross-motions for judgment on the administrative record," the Court granted Guardian's motion to amend its complaint and denied the government's motion to dismiss without prejudice. Order at 2, March 9, 2015, ECF No. 50.

## IV.    Guardian's Pre-Award Protest

Guardian filed its amended complaint on March 10, 2015, and the next day, it filed a second motion for a temporary restraining order and a preliminary injunction. In its amended complaint, Guardian asserted that the corrective action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because, "[a]s Guardian's proposal was initially determined to be the lowest-priced, technically-acceptable offeror for the East Coast, it should have been awarded the East Coast contract under the terms of the Solicitation when the Agency found MVS's East and West Coast Combined proposal to be 'Unacceptable' during the corrective action." 2d Am. Compl. at 3-4, March 10, 2015, ECF No. 52. In addition, according to Guardian, the agency's "opening of 'discussions' for MVS's East and West Coast Combined technical proposal improperly allows MVS to provide an untimely revision [to] its materially non-responsive proposal in violation of the Solicitation, the FAR and substantial case law." Id.

at 4.  Moreover, Guardian disputed the agency's new finding that its proposal was unacceptable for failure to meet the flood plain documentation requirement as "unreasonable and factually[] erroneous" because, according to Guardian, "Guardian's proposal unambiguously included such documentation, and the Defendant had previously found the documentation provided acceptable in two separate procurements."  Id. at 4.

After a status conference, the Court denied Guardian's motion for preliminary injunctive relief, finding that Guardian failed to demonstrate that it would suffer irreparable harm absent such relief.  Order, March 11, 2015, ECF No. 56.  The Court also set a briefing schedule on cross-MJARs and any motions to dismiss that the government or MVS might choose to file.  Id.

In its second MJAR, Guardian elaborated on the claims asserted in its pre-award complaint regarding the corrective action, and it made some additional arguments.  Guardian argued, for instance, that the government failed to document its reevaluation of the proposals or the rationale for the agency's determination that Guardian's proposal was unacceptable.  Pl.'s Mem. in Supp. of Second MJAR ("Pl.'s 2d MJAR") 19-22, Apr. 10, 2015, ECF No. 73.  Moreover, Guardian argued that "[b]ecause MVS did not submit its FPRs by '12 March 2015 at 1600 CST,' and no amendment to the solicitation was issued by the contracting officer prior to that time, both of MVS's FPRs are late, [and,] as a matter of law, will not be considered under FAR 52.212-1(f) of the solicitation."  Id. at 38.  Further, Guardian argued, the contracting officer's improper communications with MVS after the close of discussions, and extension to the FPR deadline solely to benefit MVS, was in violation of FAR 15.307(b).  Id. at 40.

On April 20, 2015, the government filed a motion to dismiss or, in the alternative, for judgment upon the administrative record, combined with its opposition to Guardian's MJAR.  The government argued that the Court lacked jurisdiction over Guardian's protest to the original award and the agency's decision to take corrective action for three reasons: (1) Guardian lacked standing to protest the actions of USTRANSCOM because its initial East Coast proposal was technically unacceptable; (2) USTRANSCOM had rendered Guardian's challenge to the original award moot by initiating corrective action; and (3) Guardian's challenge to the yet-to-be completed corrective action was not ripe.  See Def.'s Mot. to Dismiss or MJAR & Opp'n to Pl.'s MJAR 11-23, Apr. 20, 2015, ECF No. 82 ("Def.'s Mots. & Opp'n").  Second, the government argued that, even if the Court possessed jurisdiction, the government was entitled to judgment upon the administrative record because Guardian had failed to demonstrate that the agency acted unlawfully or unreasonably in either awarding the original contract to MVS or taking corrective action.  Id. at 23-29.

## V.      Guardian's Second Post-Award Protest

On April 30, the government notified the Court that the corrective action had again culminated in an award to MVS.  Notice, Apr. 30, 2015, ECF No. 84.  After a status conference, the Court granted Guardian leave to file a third amended complaint that would include all of its claims, pre- and post-award, in connection with the procurement under Solicitation No. HTC711-14-R-R011.  Order, May 1, 2015, ECF No. 88.  The Court also ordered the parties to propose a briefing schedule for cross-motions for judgment on the administrative record and any motions to dismiss, which similarly would cover all issues related to this procurement.  Id.  The

parties filed their proposed schedule on May 5, 2015, and the Court issued an order adopting that schedule the next day.

The government filed an amended administrative record on May 8, 2015.  The record reveals that the agency concluded that both offerors had cured the problems that had previously rendered their proposals technically unacceptable.  Specifically, as noted by the Source Selection Evaluation Board ("SSEB"), Guardian submitted "[f]lood plain reports inclusive of FEMA maps signed by a disinterested third party professional land surveyor, Mr. Dennis Taflambas, with DKT Associates, Land Surveyors confirming that the proposed facilities are located above the 100 year flood plain for the area as required in PWS paragraph 1.3.3.1.3."  AR Tab 71a at 2410.  MVS similarly submitted supplemental documentation certifying that its facilities could accommodate fifteen million gross pounds of HHG/UB annually.  AR Tab 71c at 2429.  It also provided a letter confirming that its facilities met all local fire and safety ordinances from the authorized representative for the Fire Chief of Suffolk Fire & Rescue, who serves as the Fire Marshal in accordance with Section 38-34 of the Code of the City of Suffolk, Virginia.  Id. at 2430.  Finally, MVS had provided additional supportive information confirming that all facilities include a firewall separation for every three million gross pounds and submitted flood plain reports signed by a disinterested third party professional engineer confirming that the facilities are all located above the 100 year flood plain for the area.  Id. at 2430-31.

Guardian filed its third MJAR on May 19, 2015, making substantially the same arguments that it made in its previous two MJARs, plus additional challenges to the new award.  Specifically, Guardian's arguments boil down to the following: (1) Guardian's proposal was initially determined to be the lowest-price, technically acceptable offeror for the East Coast and thus deserved the award when the agency determined that MVS's proposal was unacceptable; (2) the agency lacked a rational basis for finding Guardian's proposal unacceptable upon reevaluation; (3) MVS's initial proposal and its FPRs were late, and the agency entertained unlawful communications from MVS after the FPR deadline; (4) MVS did not provide the required fire marshal certification in its FPR; (5) the solicitation required that offerors occupy and operate their proposed facilities, and MVS does not; and (6) MVS's proposed East Coast facility is too small to accommodate fifteen million gross pounds of HHG/UB.  See generally Pl.'s Mem. in Supp. of Third MJAR ("Pl.'s MJAR Mem."), May 19, 2015, ECF No. 95.

As before, the government filed a motion to dismiss Guardian's first claim relating to the initial award and an MJAR with regard to the rest of Guardian's claims.  MVS similarly filed a Cross-MJAR.

For the reasons set forth in greater detail below, after reviewing the record and considering all of the parties arguments, the Court rules that: (1) the government's motion to dismiss Guardian's first post-award protest is **GRANTED** because that protest is moot;  (2) Guardian's motion for judgment on the administrative record with respect to its pre-award protest is **DENIED**, and the government's and the intervenor's cross-motions for judgment on the administrative record with respect to that protest are **GRANTED**; and, finally, (3) Guardian's motion for judgment on the administrative record with respect to its second post-award protest is **DENIED**, and the government's and the intervenor's cross-motions for

judgment on the administrative record are **GRANTED**.  In addition, Guardian's motions to supplement the administrative record are **DENIED**.

## DISCUSSION

### I.   The Government's and MVS's Motions to Dismiss Guardian's First Post-Award Bid Protest Are Granted Because That Protest Is Moot.

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012).  A party is an "interested party" with standing to bring suit under 28 U.S.C. § 1491(b)(1) if the party "is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract."  Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013).  A bidder has a direct economic interest if it suffered a competitive injury or prejudice.  Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing").  In a post-award bid protest, the protestor has suffered prejudice if it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  See also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech., 316 F.3d at 1319.

The government contends that the Court should dismiss Guardian's first post-award protest because Guardian lacks standing and because that protest is, in any event, moot.  With respect to standing, the government contends that Guardian cannot claim that it would have had a substantial chance of being awarded the contract because its initial East Coast proposal was technically unacceptable.  Def.'s Mot. for Partial Dismissal & MJAR & Opp'n to Pl.'s MJAR ("Def.'s Mot.") 14-16, June 1, 2015, ECF No. 98.  As the agency found upon reevaluating the proposals, the government argues, Guardian did not satisfy the requirement that offerors submit a flood plain report from FEMA, the Army Corps of Engineers, or a disinterested third party professional engineer or surveyor.  Id.  Rather, the government argues, Guardian submitted a FEMA standard flood hazard determination form ("SFHDF"), which stated that such forms were "provided to the lender pursuant to the Flood Disaster Protection Act" and "should not be used for any other purpose."  Id. at 15.  Further, the government observes, the form was prepared by CoreLogic Flood Services, not FEMA, the Army Corps of Engineers, or a disinterested third party professional engineer or surveyor, as required by the solicitation.  Id.

As discussed further below, the Court agrees with the government that the agency reasonably concluded that Guardian's flood plain report did not meet the criteria contained in the solicitation.  The Court does not agree with the government, however, regarding the effect of this finding of unacceptability upon Guardian's standing under the circumstances of this case.  Thus, although the agency reasonably found Guardian's proposal unacceptable as part of its corrective action, Guardian remained "within the zone of active consideration" because the agency had also

found MVS's proposal unacceptable and because Guardian and MVS were the only offerors whose proposals fell within the competitive range.  See Allied Tech. Grp. v. United States, 94 Fed. Cl. 16, 37 (2010) (quoting Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).  If the Court agreed with Guardian that MVS's proposal (but not Guardian's) should have been found technically unacceptable, then Guardian would be next in line to receive the award because it was the only other offeror considered for the contract.  Additionally, if the Court found that both Guardian and MVS were ineligible for award, the agency "would be obligated to resolicit the contract and [Guardian] could compete for the contract again."  Id.  Either way, Guardian "had a 'substantial chance' of receiving the award, and thus has standing."  Id.[4]

Although Guardian's first post-award protest cannot be dismissed on grounds of standing, it nonetheless must be dismissed on the government's alternative grounds, mootness.  A case is moot "[w]hen, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue." Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 939 (Fed. Cir. 2007).  In its first post-award protest, Guardian sought relief in the form of, among other things, a permanent injunction requiring "the Government to conduct a fair reevaluation of the proposals, and award a new contract, or contracts, under the terms and the conditions of the Solicitation."  Compl. at 27, Jan. 12, 2015, ECF No. 1.  In its corrective action, the agency provided precisely what Guardian requested.  Now that the agency has given both offerors an opportunity to submit FPRs, reevaluated those proposals, and issued a new award, the questions in controversy at the time of Guardian's initial protest, which concerned whether MVS' original proposal was technically acceptable, are no longer live ones.  Eskridge Research Corp. v. United States, 92 Fed. Cl. 88, 94 (2010) (finding claims in a bid protest regarding the original award moot because "the relief that would otherwise be available has already been granted due to the agency's decision to re-evaluate proposals").

Notwithstanding the foregoing, Guardian claims that its first post-award protest is not moot.  It contends that—under the terms of the solicitation itself—because MVS's original proposal was technically unacceptable, the agency was required to award the contract to Guardian.  Anything short of such an award, Guardian argues, does not offer it full relief.  Guardian cites the following language from the solicitation in support of this argument:

> If the lowest price East and West Coast offer . . . is rated unacceptable, the next lowest price East and West coast combined offer . . . will be evaluated for Technical Acceptance. . . .   If all East and West combined offers . . . with a TPP less than or equal to the overall total price of the separately evaluated lowest priced technically acceptable offers for each coast . . . are rated Unacceptable award will be made to

---

[4] As the court noted in Allied Technical Group, "[i]f the Court were to accept the Government's position, a procurement official could preclude any review of a competitive award involving two offerors simply by finding the losing offeror ineligible for award."  94 Fed. Cl. at 37. Such a position "produces an illogical result" and "is contrary to established case law and has been rejected both in the Federal Circuit and this Court."  Id.  See also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001)

the <u>initially determined</u> lowest priced technically acceptable offerors for the East Coast . . . and the West Coast . . . <u>without further consideration of any other offers</u>.

Pl.'s MJAR Mem. 21-22 (citing AR Tab 51 at 1401) (emphasis in plaintiff's brief).

According to Guardian, after the agency found MVS's East and West Coast combined proposal technically unacceptable during the corrective action, there were no longer any technically acceptable combined offers with a total proposed price less than or equal to the overall total price of the separately evaluated and initially determined lowest price offers for each coast. Therefore, Guardian argues, "the award for the East Coast contract was to go to Guardian '<u>without further consideration of any other offers</u>,' because Guardian was 'the <u>initially determined</u> lowest priced technically acceptable offeror [. . .] for the East Coast.'" Pl.'s MJAR Mem. 22 (quoting AR Tab 49 at 1386) (emphasis in plaintiff's brief).

The gist of this argument, as best the Court can understand it, is that the solicitation precluded the agency from allowing MVS to cure its technical deficiencies as part of the corrective action. Thus, Guardian contends that the agency was required to award the contract to Guardian upon finding MVS's proposal technically unacceptable, and was also precluded from reevaluating the technical sufficiency of Guardian's proposal, because Guardian's proposal had been "initially determined" to be technically acceptable.

There are numerous problems with this rather unusual interpretation of the language of the solicitation, one of them being the well-established principle that "where, in a negotiated procurement, an offeror's proposal does not comply with the solicitation's requirements, 'an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal.'" <u>ManTech Telecomm. & Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 71 (2001) (quoting <u>D & M Gen. Contracting, Inc.</u>, B-252282 et al, 93-2 CPD ¶ 104, at 3 (Comp. Gen. Aug. 19, 1993)). <u>See also</u> <u>SMS Data Prods. Grp., Inc. v. Austin</u>, 940 F.2d 1514, 1517 (Fed. Cir. 1991). Indeed, in this case, the agency did just that during the initial procurement process, by giving Guardian itself the opportunity to correct several technical deficiencies in its own initial proposal. The notion that the agency was precluded by the cited language of the solicitation from re-visiting an erroneous technical evaluation, whether during the initial award phase of this protest or as part of a corrective action, is simply an implausible reading of the "initial determination" language.

In fact, there is ample reason to believe that the agency was required, not simply permitted, to open discussions with MVS to give MVS an equivalent opportunity to revise its proposal to become technically acceptable. It is well established that if an agency conducts discussions, those discussions must be "meaningful," and they must not be "prejudicially unequal." <u>CRAssociates, Inc. v. United States</u>, 102 Fed. Cl. 698, 715 (2011); <u>Dynacs Eng'g Co. v. United States</u>, 48 Fed. Cl. 124, 131 (2000). To be meaningful, discussions must advise offerors of material proposal deficiencies and provide offerors "a reasonable opportunity to address those areas of weakness which could have a competitive impact." <u>Dynacs Eng'g</u>, 48 Fed. Cl. at 131 (quoting <u>Bionetics Corp.</u>, B-280521 et al., 99-1 CPD ¶ 7, at 4 (Comp. Gen. Oct. 14, 1998)). "Questions and requests for clarifications that do not address critical deficiencies in

10

a proposal are not meaningful discussions." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 361 (2009) (citing Dynacs Eng'g, 48 Fed. Cl. at 131).

During the agency's initial evaluation here, while the agency conducted discussions with Guardian, it only requested clarifications from MVS. See AR Tab 32. Therefore, when the agency determined as a result of Guardian's bid protest that MVS's proposal was actually unacceptable, it had not yet advised MVS of the material deficiencies in its proposal or permitted MVS to address those deficiencies with proposal revisions; that is, the agency had not afforded MVS an equal opportunity for meaningful discussions. Because the agency had not afforded MVS meaningful discussions, had the agency simply eliminated MVS from the competition and awarded the contract to Guardian as Guardian urges, "its action would have been vulnerable to serious legal challenge." ManTech Telecomm., 49 Fed. Cl. at 72.

In short, there is no merit to Guardian's argument that the agency's corrective action did not afford it all the relief it might have received in its first post-award bid protest by reevaluating both offerors' proposals and allowing both to bring themselves into technical compliance with the solicitation. Guardian's first post-award protest is moot and, accordingly, **DISMISSED**.

## II. Guardian's Motion for Judgment on the Administrative Record Is Denied, and the Government's and MVS's Cross-Motions Are Granted.

### A. Standard for Granting Motions for Judgment on the Administrative Record

Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The Court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

### B. Standard of Review in Bid Protest Cases

The court reviews challenges to an agency's conduct of a procurement under the same standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2012). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). To successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Bannum, Inc., 404 F.3d at 1351. "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d

1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa, 238 F.3d at 1338. Indeed, such a challenge can succeed only where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., Inc.–Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983)).

Given this highly deferential standard of review, the court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa, 238 F.3d at 1332-33 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). The agency need only articulate a "rational connection between the facts found and the choice made," and the court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." State Farm, 463 U.S. at 43.

### C. Guardian's Claim that the Agency Lacked a Rational Basis for Finding Its Proposal Unacceptable upon Reevaluation

Guardian challenges the agency's determination upon taking corrective action that Guardian failed to provide a flood plain report that met the requirements of PWS paragraph 1.3.3.1.3. It presents three purported bases for its challenge.

First, Guardian argues, "the Administrative Record is completely devoid of any documentation memorializing the Defendant's reevaluation . . . leading to [that] determination, or explaining the basis or reasoning for the determination that Guardian's East Coast proposal somehow became 'Unacceptable' during litigation." Pl.'s MJAR Mem. 23. According to Guardian, "[s]uch lack of documentation is contrary to FAR 15.308, which requires that SSA ["Source Selection Authority"] determinations 'shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA.'" Id. (quoting FAR 15.308) (emphasis in plaintiff's brief).

Guardian additionally argues that, contrary to the agency's determination, Guardian met the requirement that its flood plain report come from "the Federal Emergency Management Agency, the United States Army Corps of Engineers or disinterested third party professional engineer/surveyor." Pl.'s MJAR Mem. 25-26 (quoting Solicitation ¶ 1.3.3.1.3 at AR Tab 51 at 1399). Guardian submitted a FEMA SFHDF completed by CoreLogic Flood Services, which, according to Guardian, "is the industry leader in providing FEMA Flood Plain Determinations, and is specifically recognized on FEMA's website as a 'Flood Zone Determination Company.'" Pl.'s MJAR Mem. 25-26. It argues that the FEMA SFHDF that CoreLogic Flood Services prepared met the solicitation's requirements "because the FEMA Flood Hazard Determination forms are 'from' FEMA and were prepared following the FEMA rules." Id. at 26.

Finally, Guardian challenges the agency's determination regarding the flood plain report on the grounds that the agency allegedly found the same kind of documentation that Guardian provided here acceptable to meet a similar requirement in a 2007 procurement. Id. at 29-30. Guardian contends that it "reasonably relied on the Defendant's previous acceptance of this documentation" when it submitted the documents in the procurement at issue here and that "[i]t was only after Guardian protested the award to MVS [that] Defendant [found] Guardian's flood plain documentation to be 'unacceptable,' without explanation." Id. at 30.

Guardian's arguments are unpersuasive. First, even assuming that Guardian is correct that its original submission met the solicitation's requirements, prejudice is a necessary element in proving the merits of a bid protest claim. Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996))); see also CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 480 n.4 (2013) (explaining that prejudice is a necessary element of both the plaintiff's standing and the merits). In this case, Guardian suffered no prejudice as a result of the agency's conclusion that its original submission was deficient because it was given the opportunity to make its proposal acceptable to the agency, and it did so successfully. Therefore, no negative consequences for Guardian flowed from the determination that Guardian challenges.

In any event, the agency's determination that Guardian's proposal was unacceptable because its flood plain report did not meet the solicitation's requirements was a rational one. Specifically, the agency determined that Guardian failed to confirm that its facility met the requirement of PWS paragraph 1.3.3.1.3, which provided that "[a]ll storage facilities shall be located above the 100-year flood plain for the area," because Guardian failed to submit, as instructed elsewhere in the solicitation, a "[f]lood plain report from the Federal Emergency Management Agency, the United States Army Corps of Engineers or disinterested third party professional engineer/surveyor." AR Tab 51 at 1399, 1406; AR Tab 56b.

In response, Guardian does not argue that CoreLogic is a disinterested third party professional engineer/surveyor. Instead, Guardian argues that it submitted a flood plain report that was "from the Federal Emergency Management Agency" when it submitted a FEMA SFHDF prepared by CoreLogic. See Pl.'s MJAR Mem. 28 (AR Tab 28 at 575-78). But as CoreLogic specified in the "Comments" box, "[t]his flood determination is provided to the lender pursuant to the Flood Disaster Protection Act. It should not be used for any other purpose." AR Tab 28 at 575. Because Guardian submitted a form explicitly intended to be used for a different purpose and not prepared[5] by one of the three entities specified in the solicitation,

---

[5] In Guardian's response to the government's motion, Guardian argues that interpreting the provision of the solicitation that requires the flood plain report to be "from" FEMA as requiring that the flood plain report be "prepared by" FEMA constitutes a "misrepresentation." Pl.'s Resp. & Reply 11-14, June 8, 2015, ECF No. 99. In the Court's view, however, this interpretation reflects the plain and unambiguous meaning of the provision. See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004).

it was not arbitrary and capricious for the agency to conclude that it did not conform to the solicitation's requirements.

The Court also rejects Guardian's argument that the agency's determination was arbitrary and capricious because it had allegedly accepted a FEMA SFHDF as the required flood plain report in a 2007 procurement. Even if evidence about what had occurred during the prior procurement were part of the administrative record (which it is not), and even if such evidence revealed an inconsistency, it would be of no assistance to Guardian here because an agency is not bound by its actions in a previous procurement.  See Griffy's Landscape Maint. LLC, v. United States, 51 Fed. Cl. 667, 671 (2001) ("[A]n attack upon a new solicitation or upon any other aspect of the administration of the previous contract, must stand on its own."); SDS Int'l v. United States, 48 Fed. Cl. 759, 772 (2001) ("Each procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement." (quoting Renic Corp., Gov't Sys. Div., B-248100, 92-2 CPD ¶ 60, at 5 (Comp. Gen. July 29, 1992))).  Thus, each procurement must stand or fall on its own administrative record.[6]

The Court is also not persuaded by Guardian's contention that "[t]he SSA's February 19, 2015 determination that Guardian's East Coast proposal became 'Unacceptable' during the litigation is . . . irrational" in light of its prior October 24, 2014 determinations that Guardian's proposal was acceptable.  Pl.'s MJAR Mem. 29.  Of course, in its October 24, 2014 evaluation, the agency also found MVS's proposal acceptable, yet, upon reevaluation, the agency determined that this finding was error.  See AR Tab 36 at 1030.  "[A]n agency has the discretion to re-evaluate proposals during a corrective action and to correct prior evaluation errors."  Sotera Def. Solutions, Inc. v. United States, 118 Fed. Cl. 237, 262 (2014); see also Glenn Def. Marine (Asia), PTE Ltd. v. United States, 105 Fed. Cl. 541, 569 (2012) ("Agency evaluators must be allowed the discretion to review their own conclusions if they conclude a mistake has been made, or if further inquiry appears appropriate, provided the re-evaluation conforms with the solicitation, . . . and the evaluation process is conducted in a manner fair to all offerors.").  The agency's prerogative during a corrective action to reevaluate proposals and fix evaluation errors applied to Guardian's proposal as well.

Similarly, Guardian's argument that the agency's determination was not documented, and its citation of FAR 15.308 in support of that argument, are misguided.  FAR 15.308 provides, in pertinent part, as follows:

_____

[6] In fact, Guardian has moved to supplement the administrative record with, among other things, the solicitation and the FEMA SFHDF that Guardian submitted with its proposal in that 2007 competition, in which Guardian won the contract.  The Court hereby **DENIES** that motion, however, because the record here is sufficient for meaningful judicial review.  See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (2009) (holding that parties should be allowed to supplement the administrative record where the omission of the evidence would preclude effective judicial review).  Thus, the Court assesses the reasonableness of the agency's determination that Guardian's submission did not meet the requirements of the solicitation simply by comparing the requirements in the solicitation with the documentation submitted by Guardian, and as stated above, the Court concludes that the agency's determination was rational.

The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

As the language makes clear, this provision concerns the agency's final source selection decision, not its preliminary determinations of proposal deficiencies that become the subject of discussions. Compare FAR 15.306(d) with FAR 15.308. Thus, Guardian's insistence that FAR 15.308 applied to the preliminary determinations here is baseless.

Moreover, even if the documentation requirements of FAR 15.308 did apply to such preliminary determinations, Guardian's arguments still would not justify granting Guardian relief. For one thing, when an agency initiates discussions and informs an offeror that its proposal is unacceptable, the agency is not required "to address in express detail all inferior or inadequate aspects of a proposal," Banknote Corp. of Am., 56 Fed. Cl. at 385, or "'spoon-feed' [the] offeror as to each and every item that must be revised, added, or otherwise addressed to improve [its] proposal." WorldTravelService v. United States, 49 Fed. Cl. 431, 440 (2001). Therefore, the evaluation notice informing Guardian that its "proposal failed to confirm that the proposed facility(ies) is/are located above the 100 year flood plain as evidenced by a flood plain report from [FEMA], the United States Army Corps of Engineers or disinterested third party professional engineer/surveyor" surely sufficed. AR Tab 56b. And in any event, Guardian knew the agency's rationale for finding its flood plain report unacceptable based on the government's representations during this bid protest and therefore was not prejudiced by any lack of documentation. See, e.g., Def.'s Mot. to Dismiss 6 n.5, Feb. 20, 2015, ECF No. 44. In light of this and all of the foregoing, Guardian's claim that the agency lacked a rational basis for finding its proposal unacceptable upon reevaluation is without merit and, in any event, provides no basis for upholding Guardian's challenge to the agency's corrective action.

**D. Guardian's Claim that MVS's Initial Proposal and FPRs Were Late and that the Agency Entertained Unlawful Communications from MVS After the FPR Deadline**

Guardian argues that MVS's failure to include a flood plain report or certification of fire-aisle and fire-wall compliance in its initial proposal rendered that proposal nonresponsive, and according to Guardian, "partially non-responsive proposals are untimely" and "cannot be cured during discussions or proposal revisions." Pl.'s MJAR Mem. 37-39. Thus, in Guardian's view, once the agency acknowledged that MVS's proposal failed to include those required documents, any new proposal that attempted to cure those deficiencies should be considered "late" and therefore beyond the agency's authority to consider. See Pl.'s MJAR Mem. 39-40.

The flaw in Guardian's reasoning is its use of the concept of responsiveness in this context. "The FAR confines the concept of responsiveness to sealed bidding," whereas the procurement at issue here is a negotiated procurement. Dyonyx, L.P. v. United States, 83 Fed. Cl. 460, 468 (2008). "[U]nlike a non-responsive bid in sealed bidding . . . , a technically

unacceptable proposal [in a negotiated procurement] may be considered for award if the proposal would otherwise be competitive and if its technically unacceptable terms can be cured by the offeror in a revised proposal." Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325, 341-42 (2009). The agency here acted in accordance with this principle when, as part of its corrective action, it permitted MVS to cure the defects in its proposals by submitting FPRs.

Guardian's further argument—that MVS's FPRs were "late" within the meaning of FAR 52.212-1 "because MVS failed to submit FPRs for either its West Coast Only or East and West Coast Combined proposals by '12 March 2015 at 1600 CST'"—is similarly without merit. Pl.'s MJAR Mem. 40. Thus, Guardian argues that, to extend the FPR deadline beyond "12 March 2015 at 1600 CST," the agency was required to issue an amendment to the solicitation, and that the agency's email granting MVS's request for an extension "was not an 'amendment' to the Solicitation . . . because it did not include the minimum information requirements [of] FAR 15.206(f)." Id. Further, Guardian argues that the agency's extensions of the FPR deadlines were "solely to benefit MVS" and constituted "improper communications [. . .] after the close of discussions" in "violation of FAR 15.307(b)." Id. at 41-42.

Again, Guardian's logic is flawed. First, Guardian's premise that an agency must amend the solicitation when extending an FPR deadline has no support in the language of the FAR or any case of which the Court is aware. Under FAR 15.206(a), an amendment to the solicitation is required only "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions." While Guardian views an extension of the FPR deadline as a change in the "requirements or terms and conditions," Pl.'s Resp. & Reply 20-21, case law and other authority suggest that FAR 15.206 refers to substantive changes in evaluation criteria that would cause offerors to alter their proposals. See SP Sys., Inc. v. United States, 86 Fed. Cl. 1, 18 (2009); John Cibinic Jr. & Ralph C. Nash, Jr., Formation of Government Contracts 745, 825 (4th ed. 2004). And even if a likelihood that a change would cause offerors to alter their proposals is not the defining factor in whether an amendment to the solicitation was required, it certainly is the defining factor in determining whether an offeror was prejudiced by an agency's failure to issue an amendment. Elec. Data Sys., LLC v. United States, 93 Fed. Cl. 416, 435, 439 n.30 (2010). Here, the absence of an amendment caused no prejudice to Guardian because the agency notified Guardian of the extension by email. AR Tab 63. Therefore, even if the agency acted contrary to FAR 15.206 when it extended the FPR deadline without issuing an amendment, this could not be a basis for granting the relief that Guardian seeks.

Because Guardian's premise, that the extension of the FPR deadline past 12 March 2015 without a solicitation amendment violated FAR 15.206, is incorrect, Guardian's conclusion, that MVS's FPRs were "late" and should not have been considered, is also meritless. FAR 52.212-1(f)(2)(i) sets forth what is known as the "late is late" rule as applicable to procurements of commercial items. It states that "[a]ny offer, modification, revision, or withdrawal of an offer received at the Government office designated in the solicitation after the exact time specified for receipt of offers is 'late' and will not be considered unless" certain conditions, not relevant here, are met. FAR 52.212-1(f)(2)(i). Here, the time specified for receipt of FPRs was 20 March

2015, and the agency received MVS's FPRs on 18 March 2015. AR Tabs 67, 67a. Clearly, therefore, MVS's FPRs were not late, and the agency's consideration of them was not improper.[7]

Guardian's third argument related to the submission of FPRs—that the agency's extensions of the deadline constituted improper communications after the close of discussions in violation of FAR 15.307(b)—lacks merit as well. FAR 15.307(b) provides, in pertinent part, as follows:

> At the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision. The contracting officer is required to establish a common cut-off date only for receipt of final proposal revisions. Requests for final proposal revisions shall advise offerors that the final proposal revisions shall be in writing and that the Government intends to make award without obtaining further revisions.

As Guardian observes, the court in Dubinsky v. United States, 43 Fed. Cl. 243 (1999), concluded from FAR 15.307(b) that "once the request for final proposal revisions has been issued at the conclusion of discussions, it follows that an agency generally may not engage in further discussions with any offerors." 43 Fed. Cl. at 261. Contrary to Guardian's argument, however, the agency's emails responding to and granting MVS's requests for extensions did not constitute "discussions." Under FAR 15.306(d), "'discussions' involve 'negotiations,'" and "[b]ecause discussions involve negotiations, they may include 'bargaining,' which 'includes persuasion, alteration of assumptions and positions, give-and-take, and may apply to price, schedule, technical requirements, type of contract, or other terms of a proposed contract." Info. Tech., 316 F.3d at 1321 (quoting FAR 15.306(d)). In addition, "discussions 'are undertaken with the intent of allowing the offeror to revise its proposal.'" Info Tech., 316 F.3d at 1321 (quoting FAR 15.306(d)). By contrast, the limited email exchanges between the agency and MVS involved no mention of "price, schedule, technical requirements, type of contract," or anything of that nature; such topics were addressed prior to the agency's request for FPRs.

In any event, Guardian's argument that the agency's emails responding to and granting MVS's request for an extension were improper succumbs to the same flaw that the Court has observed in many of Guardian's arguments: Guardian has not demonstrated that it suffered any prejudice as a result of the email exchanges between MVS and the agency. Guardian contends

---

[7] In arguing that MVS's FPRs were late and should not have been considered, Guardian relies upon Geo-Seis Helicopters, Inc. v. United States, 77 Fed. Cl. 633 (2007), a case that is clearly inapposite. Pl.'s MJAR Mem. 41. In Geo-Seis Helicopters, an offeror requested an extension shortly prior to the 2:00 p.m. deadline. 77 Fed. Cl. at 637. The offeror's proposal revision arrived at 2:30 p.m., and it was not until 3:29 p.m. and 3:31 p.m. that the contracting officer emailed each offeror in the competitive range, notifying them that the deadline would be extended to 4:00 p.m. Id. The Court held that the contracting officer contravened the "late is late" rule because it did not have authority to accept the late proposal revision and then, after the deadline had passed, issue a post-hoc extension. Id. at 640-46. By contrast, here, the agency notified the offerors of the extension at approximately 3:30 p.m., one half hour before the deadline. See AR Tab 63.

that the FPR extension was "solely to benefit MVS," but this contention has no bearing on whether Guardian was prejudiced.  Even if MVS was the only offeror that actually needed the extension, Guardian nevertheless received the benefit of the extension.  In other words, even if the agency conducted discussions after it requested FPRs, it did not do so in favor of one offeror over another in violation of FAR 15.306(e).  See Dubinsky, 43 Fed. Cl. at 264.  Rather, the agency established a "common cut-off date . . . for receipt of" FPRs, precisely as FAR 15.307(b) required it to do.  FAR 15.307(b) (emphasis added).

### E.  Guardian's Claim that MVS Did Not Provide the Required Fire Marshal Certificate in Its FPR

Guardian argues that the agency committed error when it concluded in its April 2015 decision that the documentation that MVS submitted to fulfill the fire marshal certification requirement complied with the solicitation.  Pl.'s MJAR Mem. 47.  The Court finds this argument meritless.

The solicitation includes two provisions relevant to this issue.  The first, paragraph (b)(2)(D)(i)(h) in the addendum to FAR 52.212-1 ("Instructions to Offerors"), requires offerors to submit "[d]ocumentation signed by the Local Fire Marshall [sic] (or authorized representative) affirming that the facility meets all local codes and ordinances dated within 30 days of proposal submission date."  AR Tab 51 at 1399.  The second, PWS paragraph 1.3.3.1.2, provides, "All storage facilities shall provide firewall separation for every three (3) million gross pounds of stored personal property lots.  Fire aisles shall meet local fire regulations as evidenced in the approved Fire Marshal Certification for all storage facilities."  AR Tab 51 at 1406.

To address these requirements with respect to its East Coast facilities, during the initial round of this procurement, MVS submitted a letter from Kevin Hughes, director of economic development for Suffolk, Virginia.  AR Tab 29 at 749.  In response to the agency's request for clarification, MVS provided another letter from Mr. Hughes, stating that MVS's proposed facilities "comply with all local codes and ordinances" and that he was acting "as an authorized representative of the City of Suffolk on behalf of the Suffolk Building Official, John S. Wilson."  AR Tab 29 at 751.  MVS also provided a letter from Mr. Wilson, confirming that MVS's "facilities are complete and meet all local codes and ordinances."  AR Tab 29 at 752.

On the West Coast, MVS has two facilities in different localities, and it submitted documentation accordingly.  For its facility in Fairfield, California, MVS provided drawings and a letter signed by the local Fire Inspector/Plans Examiner, Mark Hollan, stating that MVS's facility there complied with the local building code.  AR Tab 29 at 742-44.  For its facility in Benicia, California, MVS submitted a drawing and a form signed by a division chief from the local fire department, Nicolas Thomas, as well as a letter signed by the Senior Building Inspector in Benicia, California, "certify[ing] that the fire division wall within the facility . . . is a continuous, unbroken solid wall without openings, doors or windows with a minimum fire resistive rating of not less than 1 hour."  AR Tab 29 at 745-48.

When the agency took corrective action, it determined that MVS's submissions were deficient and issued an evaluation notice to MVS, which stated as follows:

Your proposal failed to address/confirm that all East & West Coast storage facilities shall provide firewall separation for every three (3) million gross pounds of stored personal property lots.  Fire aisles shall meet local fire regulations as evidenced in the approved Fire Marshal Certification for all storage facilities. Further documentation (maps, drawings, etc.) which confirms that all fire aisles meet local fire regulations is required.

AR Tab 57e at 2151.

In response, MVS provided additional documentation.  For example, for its East Coast facilities, MVS provided a drawing and report certified by a Virginia Fire Protection Engineer, an email from Captain Charles P. Chapin of the Suffolk Fire and Rescue confirming that he "review[ed] the report from the Virginia Fire Protection Engineer," and a letter confirming that Captain Chapin "is an authorized representative for the Fire Chief of the Suffolk Fire & Rescue, who serves as the Fire Marshal in accordance with Section 38-34 of the Code of the City of Suffolk Virginia."  AR Tab 67g at 2334-37.  Captain Chapin confirmed that MVS's proposed facility met all local fire and safety codes and ordinances.  AR Tabs 67b at 2253; 67c at 2264. For its Fairfield, California facility, MVS provided an email that its president, Dennis Paulley, sent to Mr. Hollan and Mr. Hollan's response, confirming that he was the "authorized representative of the City of Fairfield Fire Marshall [sic] and that [MVS's] facility [in Fairfield] meets all local codes and ordinances."  AR Tab 67g at 2332.  Finally, for its Benicia, California facility, MVS submitted a letter from the Fire Chief of the City of Benicia, confirming that "Division Chief Nicolas Thomas is an authorized representative of the Fire Chief/Fire Marshal." AR Tab 67g at 2333.

The Source Selection Evaluation Board ("SSEB") concluded that MVS's responses to the evaluation notices were acceptable.  AR Tab 71 at 2404.  It summarized as follows:

Metropolitan provided supplemental documentation for Tab G which met the requirement of the RFP and confirmed that all proposed West Coast facilities meet all local fire and safety codes and ordinances. Supplemental documents were provided in Tab G confirming the requirement for firewall separation for every three (3) million gross pounds of stored property lots. PWS paragraph 1.3.3.1. (pg. 25) and PWS paragraph 1.3.3.1.2. (pg. 26) were updated in the FPR.

AR Tab 71 at 2404.

Guardian nevertheless contends that the agency should have found MVS's FPR unacceptable for failing to provide a proper fire marshal certification for its East Coast facility. Pl.'s MJAR Mem. 47-48.  Specifically, Guardian argues,

Captain Chapin's March 10, 2015 letter . . . could not have been a "certification" under the local Virginia Statement Fire Prevention Code ("SFPC"), because Section 106 (Duties and Powers of the Fire Official) of the Virginia SFPC requires

that fire marshal certifications must be based on a preceding inspection to determine the extent of compliance with the code . . . .

Pl.'s MJAR Mem. 47 (citing AR Tab 67c at 2264).  Guardian observes that Captain Chapin's letter states that "[p]rior to occupancy, inspections will be conducted to ensure all life safety items are in proper operating order."  Pl.'s MJAR Mem. 48.  Thus, Guardian concludes, because the fire marshal certification "can only be made pursuant to an 'inspection,' which was clearly not done as stated in the March 10, 2015 letter itself, MVS's East and West Coast Combined FPR could not have contained the required certification, and, therefore, was unacceptable under the terms of the Solicitation."  Id.

Guardian's interpretation of the fire marshal certification requirement in the solicitation imputes to the solicitation a state-law definition of such a certification.  But nothing in the solicitation suggests that it incorporates the Virginia code provision that Guardian cites (or any other state or local provision of law), nor is the term "fire marshal certification" so ambiguous that a reference to state law is required to imbue it with meaning.  When interpreting the terms of a solicitation, a court must "consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  Banknote Corp. of Am., 365 F.3d at 1353.  Thus, the Court interprets the fire marshal certification requirement in PWS paragraph 1.3.3.1.2 as referring to the "[d]ocumentation signed by the Local Fire Marshall [sic] (or authorized representative) affirming that the facility meets all local codes and ordinances dated within 30 days of proposal submission date" described in paragraph (b)(2)(D)(i)(h) in the addendum to FAR 52.212-1.  AR Tab 51 at 1399.

Given this interpretation, the agency's determination that MVS's FPR fulfilled the fire marshal certification requirement was reasonable.  MVS submitted letters and emails dated within thirty days of the FPR submission date and signed by local officials, affirming that they were the authorized representatives of the local fire marshals and that the facilities met all local codes and ordinances.  AR Tab 67g at 2332-35.  MVS moreover submitted drawings showing that the firewalls and fire aisles met all requirements and regulations.  AR Tab 67 at 2326, 2328, 2330, 2337.  Therefore, Guardian's argument that MVS failed to provide an acceptable fire marshal certification lacks merit.

## F.  Guardian's Claim that MVS Does Not Occupy or Operate an East Coast Facility

Guardian argues that PWS paragraph 1.3.3.1 requires offerors to occupy and operate their proposed facilities at the time they submit their proposals, and that MVS does not meet this requirement because, by its own admission, MVS does not currently occupy or operate an East Coast facility.  Pl.'s MJAR Mem. 48-49.  Guardian, however, misconstrues PWS paragraph 1.3.3.1.  That paragraph provides, in pertinent part, as follows:

The contractor shall operate warehouse storage facilities capable of storing up to fifteen million (15,000,000) gross pounds of HHG/UB annually.  A primary facility within a 50 mile radius of the Port of Norfolk, VA (for Eastern CONUS shipments)

and/or the Port of Oakland, CA (for Western CONUS shipments) as applicable, is required for receipt of shipments.

AR Tab 51 at 1406.  The language of this provision does not, either explicitly or implicitly, require offerors to occupy and operate such facilities at the time they submit their proposals.  Indeed, if offerors were required to own or lease facilities without knowing whether or not they would be awarded the contract, they would have to be willing to risk losing an investment or breaking a lease, perhaps creating an unfair advantage for the incumbent.  Further, as the government points out, pursuant to PWS paragraph 1.3.1.1.1, offerors were not required to be operational until "30 days after award."  Def.'s Mot. 24-25.[8]  In short, when considered in consonance with the rest of the solicitation, it is more reasonable to read PWS paragraph 1.3.3.1 as the agency read it: to require offerors to have an approach for achieving occupation and operation of such facilities in the event that they do receive the award.  AR Tab 51 at 1399; AR Tab 71a at 2408.

As MVS has identified its proposed facilities and submitted documentation demonstrating that those facilities comply with the solicitation and local regulations, the agency determined that MVS satisfied the requirements of PWS paragraph 1.3.3.1.  See AR Tab 71 at 2404; AR Tab 67e at 2284-86.  The Court sees no basis for finding that this determination was arbitrary and capricious and thus rejects Guardian's argument.

### G.  Guardian's Claim that MVS's Proposed East Coast Facility Is Too Small to Accommodate Fifteen Million Gross Pounds of HHG/UB

Guardian's final argument is that, based on an estimate of dimensions derived from a publicly available flyer and one of several formulas for calculating storage capacity discussed by another judge in a 2010 case involving the same contract, MVS's proposed East Coast facility is not capable of storing up to fifteen million gross pounds of HHG/UB annually, as required by PWS paragraph 1.3.3.1.  Pl.'s MJAR Mem. 49-55 (citing Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 267-68 (2010)).  The Court is not persuaded by this argument.

First, the Court has no basis for concluding that the formula upon which Guardian relies is a reliable one.  The formula was not included in the solicitation, is not supported by any evidence in front of the agency, and was not discussed by the agency.  Nor can the Court endorse

---

[8] Guardian argues that the thirty-day period for becoming fully operational set forth in PWS paragraph 1.3.1.1.1 "only relates to its higher-tier subparagraph PWS Subparagraph 1.3.1.1, which deals exclusively with the TOPS system (which is an electronic Government personal property inventory and logistics system (i.e., a computer program))."  Pl.'s MJAR Mem. 46.  The Court rejects this narrow interpretation of paragraph 1.3.1.1.1 because it is unsupported by the language of the provision (referring to the requirement to be "fully operational to begin accepting HHG/UB inventory") and inconsistent with the broad purpose of the section within which the paragraph appears as evidenced by its title, "Contractor Transition."

an application of that formula based on estimates drawn from a publicly available flyer that was not before the agency.[9]

While the court in Metropolitan Van & Storage discussed the formula Guardian describes in its brief, it did not rely upon the formula to refute an offeror's representations that its facility met the solicitation's storage capacity requirement. 92 Fed. Cl. at 263-68. To the contrary, in Metropolitan Van & Storage, neither the government nor the intervenor in that case (Guardian) "even suggested that Guardian's proposal satisfied" the requirement that "[t]he Contractor shall provide storage facility space sufficient to store up to fifteen million (15,000,000) gross pounds of personal property lots annually.'" Id. at 267. Nor did they challenge any aspect of the formula or its assumptions. Id.

In this case, there is no agreement or stipulation regarding the methodology that should be used to determine the storage capacity of MVS's warehouse, and there is no concession by MVS that its facility does not meet the fifteen million gross pound requirement. To the contrary, the agency's conclusions regarding warehouse capacity were based upon MVS's representations of the size and capacity of its facilities. AR Tab 67e at 2284-85. An agency "may accept a [proposal's] representation that indicates compliance with the solicitation requirements," Spectrum Sys., Inc., B-401130, 2009 CPD ¶ 110, at 3 (Comp. Gen. May 13, 2009), except "where a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement]." Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1330-31 (Fed. Cir. 2011) (emphasis and alteration in original) (quoting Orincon Corp., B-276704, 97-2 CPD ¶ 26, at 4 (Comp. Gen. July 18, 1997)); see also Centech Grp., Inc. v. United States, 554 F.3d 1029, 1034 (Fed. Cir. 2009). "[I]f the agency accepts a proposal based on a misleading representation, the dispute is solely between the agency and the awardee" as a matter of contract administration. Furniture by Thurston v. United States, 103 Fed. Cl. 505, 519-20 (2012). See also Allied Tech., 649 F.3d at 1330 (citing Centech, 554 F.3d at 1039).

Because nothing on the face of MVS's proposal should have led the agency to conclude that MVS's facilities could not store up to fifteen million gross pounds of HHG/UB annually, the agency's determination that MVS's proposal was acceptable in this regard was not arbitrary and capricious. Moreover, if Guardian is correct that MVS's facilities cannot fulfill this requirement,

---

[9] Although Guardian has moved the Court to include the flyer within the administrative record, that motion is **DENIED**. Indeed, the Court **DENIES** in total each of Guardian's motions to supplement the administrative record: Pl.'s Mot. to Supplement AR, Apr. 14, 2015, ECF No. 76; Pl.'s 2d Mot. to Supplement AR, June 10, 2015, ECF No. 100. The task of this Court is "to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985). The Court concludes that Guardian has failed to establish that "effective judicial review" requires that the Court admit Guardian's proffered extra-record evidence. See Axiom Res. Mgmt., Inc., 564 F.3d at 1380.

this will become a matter of contract administration between MVS and the agency.  Thus, Guardian's final argument, like its others, is meritless.[10]

## CONCLUSION

In accordance with the above opinion, the Court **ORDERS** as follows:

1. Guardian's motions to supplement the administrative record are **DENIED**.

2. The government's motion to dismiss is **GRANTED** as to Guardian's first post-award protest.  Accordingly, Counts I through V of Guardian's Third Amended Complaint are **DISMISSED**, without prejudice, as moot.

3. Guardian's motion for judgment on the administrative record is **DENIED**.

4. The government's and MVS's cross-motions for judgment on the administrative record are **GRANTED**.

The Clerk is directed to enter judgment accordingly.  Each party shall bear its own costs.

In addition, pursuant to the Court's January 15, 2015 Protective Order, this Opinion and Order has been issued under seal.  The parties shall file any proposed redactions to this Opinion and Order on or before July 7, 2015.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan

---

[10] In its response to the government's and MVS's cross-MJARs and reply in support of its own MJAR, Guardian for the first time argues that the award to MVS was unlawful because FAR 9.104-1(f) as well as the Defense Transportation Regulation ("DTR"), which is referenced in the solicitation, required the agency to conduct a pre-award survey to, among other things, confirm that MVS's storage facilities are compliant.  Pl.'s Resp. & Reply 29-30.  The sole reference to these regulations in Guardian's opening brief was an indirect one contained in a footnote concerning whether the administrative record submitted by the government was complete.  Pl.'s MJAR Mem. 14 n.5.  In any event, assuming that the argument is not waived, the argument is meritless.  FAR 9.104-1(f) requires that, "[t]o be determined responsible, a prospective contractor must . . . [h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them."  This provision does not require the agency to conduct a pre-award survey, and to the extent that Guardian argues that the agency erred in finding MVS responsible, Guardian has not identified any record evidence to support such an argument.  Moreover, with respect to Guardian's citation to the DTR, the Court does not read this regulation as requiring a pre-award survey in every non-temporary storage procurement by this agency; it merely sets forth guidelines and procedures that will be "used when making pre-award surveys."  DTR App. D at ¶ A, available at http://www.transcom.mil/dtr/part-iv/dtr-part-4-app-d.pdf.

ELAINE D. KAPLAN
Judge